DECISION
This matter is before the Court on the parties' Cross-Motions for Partial Summary Judgment. This Court has jurisdiction pursuant to Rule 56 of the Superior Court Rules of Civil Procedure.
 Facts/Travel
According to the parties, Sea Fare's American Cafe (Sea Fare) and Brick Market Place Associates (BPMA) have enjoyed a landlord/tenant relationship since 1992. At the commencement to their relationship, the parties entered into a series of agreements. Two of these agreements form the basis of this lawsuit. The first agreement at issue is a ten year lease whereby Sea Fare became the largest tenant in the Brick Market Place. The second allowed the plaintiff to buy, for $100,000, the restaurant equipment which defendant repossessed from the previous occupant. Disputes have since arisen regarding terms in the lease and the separate contract for the equipment. Unable to settle the disputes, the plaintiff brought a suit for declaratory judgment and damages. The parties have since filed the instant cross-motions for summary judgment.
 Summary Judgment
Rhode Island Super. R. Civ. Proc. 56, governing summary judgment, requires a trial justice to determine the necessity of trial by identifying a genuine issue of material fact in dispute.Rotelli v. Catanzaro, 685 A.2d 91 (R.I. 1996). To avoid summary judgment, the party opposing the motion cannot rest upon conclusions or mere allegations or denials in the pleadings; rather, the party must affirmatively set forth competent evidence that raises a genuine issue to be resolved. Sisters of Mercy ofProvidence, Inc. v. Wilkie, 668 A.2d 650, 652 (R.I. 1996). A trial justice may properly grant summary judgment only when, after reviewing the evidence in light most favorable to the non-moving party, the trial justice concludes that no genuine issue of material fact exists and the moving party's claim warrants judgment as a matter of law. R.I. Super. R. Civ. P. 56 (c);Harritos, et al., v. Cambio, et al., 683 A.2d 359 (R.I. 1996).
 TERMS OF THE LEASE
The ten year lease under which the parties are operating requires the Sea Fare to pay a base rent of $4,000 per month, an additional rent based upon a percentage of gross sales, and a percentage share of real estate taxes and operating expenses on the property. (Lease, pp. 2-8)
The indenture of lease demises to Plaintiff "6600 square feet of floor space within the building . . . at 151 Swinburne Row. . . . Said land and building is hereinafter called the `Property'" (Lease, p. 1) The lessee is obligated to pay, as additional rent, its share of any and all taxes assessed against the Properly. (Lease, 5)
Although the Plaintiff's percentage share is calculated according to total rentable space within the building, that figure is adjustable according to the total rentable space available within the Property. (Lease, p. 7) The lessee Plaintiff must pay its percentage share of lessor's expenses in operating the "Property." The expenses to which the Plaintiff contributes include: maintenance of the parking lot, snow removal from the parking lot, drainage for the parking lot, and provision of adequate lighting for the parking lot." (Lease, paragraph 4) Moreover, Plaintiff must share in lessor's expenses associated with the depreciation of and repairs to machinery and equipment used in maintaining and operating the common areas within theProperty. (Lease, p. 7) Included in Plaintiff's rent is the right to occupy 4 designated parking spaces without charge. (Lease, paragraph 6) At its sole cost and expense, plaintiff is required to maintain public liability insurance "on the demised premises and public areas, including the parking lot" (Lease, paragraph 9 (b)) A review of the asset transfer agreement reveals that the Defendant warranted to Plaintiff that no conditions existed which would adversely impact upon Plaintiff's use of the leased premises "for a restaurant with a parking lot." [Paragraph 4 (a)); (emphasis added)]
At the time these representations were made and the lease was signed, there was already in existence an oral agreement between Jay Schochet (General President of BMPA and Jay Schochet Holdings) and Jack Booth for the latter to "rent" the parking lot and turn over 75% of the revenue to Schochet. Since the signing of the lease, however, conditions with reference to the parking lot have changed to the detriment of Plaintiff.
It is undisputed that Booth and Defendant's Property Manager, Daniel McSweeney, assured Plaintiff's principal, George Karousos, prior to the signing of the lease, that Sea Fair's patrons would be charged for parking only from Memorial Day to Labor Day. During the second year of the lease, and ever since, Sea Fare's patrons have had to pay for parking all year round. The four spaces guaranteed to the Plaintiff as part of his lease are now available to the general public, as is the entire lot. Originally, it was represented to Mr. Karousos that the use of the lot would be reserved for Brick Market patrons only. The lot has also increased in size by the addition of nine spaces. Not only are Plaintiff's designated spaces often rented to the general public, Plaintiff is also deprived of the 25 spaces required to be dedicated to the restaurant as a condition of the liquor license.
There is no evidence that Jack Booth contributes anything to the maintenance of and/or the insurance for the parking lot. Those costs have been borne entirely by the Brick Market tenants according to their percentage share of "rentable space." Plaintiff is compelled to pay Defendant for maintenance of a lot it cannot now use in conformance with the lease provisions while Jay Schochet, albeit in the guise of a holding company, is collecting 75% of the revenues the lot is generating. The operator of the lot is "renting" this space and the tenants are bearing the cost its care. This arrangement is inherently inequitable.
The Court is of the opinion that this now public parking area constitutes an increase in the rentable space. Plaintiff's motion to adjust its percentage share accordingly is granted.
 Missing Inventory
On February 15, 1992, the parties entered into an agreement for the purchase and sale of business assets including the furniture, fixtures and equipment repossessed by the Defendant from the prior occupant. The agreement provides that "the Seller assumes all risk of destruction, loss, or damage . . . up to the dateof closing." [Paragraph 9 of the agreement, (emphasis added)].
According to the second affidavit submitted by George Karousos, before the lease was signed, he received an anonymous telephone call informing him that items were being removed from the restaurant (Affidavit p. 3). Mr. Karousos called the Property Manager for Brick Market, Daniel McSweeney, and asked him to investigate. Id.
 "[McSweeney] got back to [Karousos] and told him he spoke with the manager of Dave Eddie's and he was assured that only personal items were being removed. (Karousos] told McSweeney [he] wanted to be sure that none of the items [he] had agreed to purchase like glassware, dinnerware, etc. were not being removed. McSweeney told [him] not to worry because Brick Market Place Associates was holding $50,000 of Dave Eddie's money in escrow and the funds would not be released until [Plaintiffs] got [their] keys to the premises and took over the restaurant and had an opportunity to be sure that nothing bad been removed." Id
The lease was signed on the following day and the keys were exchanged but plaintiffs were not scheduled to take possession for a couple more days. Id. Two days after the closing, Mr. Karousos went to survey the restaurant and discovered that the glassware, dishes and silverware were missing. Id. p. 4. He immediately called Mr. McSweeney who assured him that the money was still in escrow and would be available to cover the loss. Id. Plaintiff claims that it expended $10,000 to replace the missing inventory and has not been reimbursed for this expense.
The Defendant claims that at the time the loss was discovered, the Plaintiff had assumed the risk-of-loss because the discovery was made after the closing date. In support of this argument the Defendant relies on the aforementioned section in the purchase and sale which states that Defendant has the risk of loss up until the time of closing.
According to the Defendant, "Sea Fare admitted that there was an inventory conducted of `what was on the premises' before Sea Fare moved it." Defendants' Memorandum in Opposition toPlaintiffs' Motion for Partial Summary Judgment at 16 citingAnswer of Plaintiff, Anna Karousos to Defendants' Interrogatory No. 10; Answer of Plaintiff, George Karousos to Defendants' Interrogatory No. 10; Affidavit of James J. Marcellino.
Having reviewed the entire record, and giving particular attention to the documents upon which the parties place the most reliance, this Court believes that, as the Defendants contend, a general inventory was conducted at some point after the closing. At that time, the Plaintiffs took notice of the dishes, silverware and other items that were left behind by the previous tenants. The fact that these items were included in the Defendants' offer for sale seemed important because in Plaintiffs' words, They thought they would have a "turn-key operation." The day before the closing, Plaintiff Karousos received a call informing him that some of the equipment was being removed from the restaurant. He immediately called the Defendant and received assurance that all was well. At this point, the Defendant was on notice and had an obligation to investigate the situation thoroughly, as the risk of loss was on the Defendant. It is important to note that the plaintiff had no legal right to the space at this time and did not have a key to the premises. Therefore, it was not until the day of closing or sometime thereafter, that the plaintiff had an opportunity to again inventory the premises. Defendant's contention that the risk of loss "contractually shifted" to Plaintiff after the closing is ludicrous.
The Defendant in this case agreed to carry the risk of any loss which occurred prior to closing. The undisputed facts in this case as supported by the records indicate that the loss of equipment in fact occurred the day before the parties closed. Therefore, the Defendant is responsible for reimbursing the Plaintiffs for the cost expended to replace the items. The Plaintiffs' motion for summary judgment is granted.
The Defendant has also moved for partial summary judgment, requesting the Court to declare Plaintiff in default of lease obligations. In connection "with this claim, Defendant has made the bald assertions that "Plaintiff has failed to pay portions of the additional rent and has failed to pay for the portion of the water and sewer charges set forth in the lease." (Defendant's Memorandum, p. 6). A review of Defendant's citation to Plaintiff's responses to interrogatories reveals only that Plaintiff has, in good faith, questioned the Defendant's calculation or additional rent. Sum certain items have been religiously and promptly paid to Defendant for the past seven years. What Plaintiff is rightfully seeking is documentation from the Defendant to support its claim for increased operating expenses. Since no supporting documents have been furnished to Plaintiff, Plaintiff has declined to pay. It is well within Plaintiff's right to do so.
Defendant has asserted no grounds whatsoever upon which a motion for summary judgment could properly be based. Therefore, Defendant's motion for summary judgment is denied.